**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION**

**CIVIL CASE NO. 1:07cv184**

| | | |
|---|---|---|
| **BORGWARNER, INC. and** | ) | |
| **BORGWARNER TURBO** | ) | |
| **SYSTEMS, INC.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **MEMORANDUM OF** |
| | ) | **DECISION AND ORDER** |
| **HONEYWELL INTERNATIONAL, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| **_____** | ) | |

**THIS MATTER** is before the Court on the Plaintiffs' Motion to Exclude

from Evidence Expert Testimony of Christopher Reed, John T. Goolkasian,

and Brent Robinson [Doc. 104] and the Defendant's Motion to Exclude

Certain Expert Opinions of Dr. J.C. Poindexter, Paul Novak, and Dr. John

Thorne [Doc. 118].

## I.    INTRODUCTION

This is an action brought by the Plaintiffs BorgWarner, Inc. and

BorgWarner Turbo Systems, Inc. (collectively "BorgWarner") against the

Defendant Honeywell International, Inc. ("Honeywell") for patent infringement of U.S. Patent Nos. 6,663,347("the '347 Patent"); 6,629,556 ("the '556 Patent"); and 6,904,949 ("the '949 Patent"). [Second Amended Complaint, Doc. 65]. The patents-in-suit are directed to an investment cast titanium compressor wheel, and specifically a wheel that is manufactured by a fully automated process and that is "pullable." As that term has been construed by the Court, "pullable" refers to the ability during the manufacturing process to withdraw the die inserts used to cast the wheel radially or along a curvature so as to render the wax pattern easily removable from the die. [Claim Construction Order, Doc. 79-1 at 52].[1]

Honeywell denies engaging in any infringement and asserts, among other things, the affirmative defenses of invalidity, unenforceability, inequitable conduct, and license and/or ownership of the patents-in-suit. With respect to the defense of invalidity, Honeywell contends that pullable cast titanium compressor wheels existed long before the patent applications were filed. Specifically, Honeywell contends that as early as 1996, a tool was developed by toolmaker B&R Mold to create wax patterns

---

[1]The investment casting of titanium, and in particular of titanium compressor wheels, is discussed extensively in the Court's Claim Construction Order [Doc. 79].

for a pullable cast titanium compressor wheel (the "Holset Wheel").[2]

Honeywell contends that the Holset Wheel and its method of manufacture

anticipates or renders obvious every limitation of the claims asserted by

BorgWarner in this case. [See Honeywell's Motion for Summary Judgment,

Doc. 110 at 6-7]. BorgWarner contends that the Holset Wheel does not

invalidate the patents-in-suit, because the tooling which was used to

manufacture the Holset Wheel pattern was not fully automated, and the

resulting wheel had such complex retraction paths that the wheel could not

be considered "pullable." [See BorgWarner's Opposition to Honeywell's

Motion for Summary Judgment, Doc. 129 at 6-13].

## II.    STANDARD OF REVIEW

The parties' motions to exclude [Docs. 104, 118] challenge the

reliability and admissibility of certain expert opinions pursuant to Federal

Rule of Evidence 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc.,

509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).  Rule 702 provides

as follows:

---

[2]The Holset wheel was manufactured by Precision Castparts Corporation
("PCC") and sold to Holset Engineering, Ltd. ("Holset"), a competitor of BorgWarner, for
use in Holset's turbochargers.

>If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. The trial judge must act as a gatekeeper, admitting only that expert testimony which is relevant and reliable. Daubert, 509 U.S. at 589, 113 S.Ct. 2786. With regard to scientific knowledge, the trial court initially must determine whether the reasoning or methodology used is scientifically valid and is applied properly to the facts at issue in the trial. Id. at 592-93, 113 S.Ct. 2786. To aid the Court in this gatekeeping role, the Supreme Court has identified several key considerations, including whether the expert opinion can be tested; whether it has been subjected to peer review; the error rate of the methods that the expert employed; the existence and maintenance of standards used in the expert's methods; and whether the expert's methods are generally accepted in the scientific

community.  Id. at 592-94, 113 S.Ct. 2786; Anderson v. Westinghouse

Savannah River Co., 406 F.3d 248, 261 (4th Cir. 2005).[3]

The objective of Daubert's gatekeeping requirement is to ensure "that

an expert, whether basing testimony upon professional studies or personal

experience, employs in the courtroom the same level of intellectual rigor

that characterizes the practice of an expert in the relevant field."  Kumho

Tire Co. v. Carmichael, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d

238 (1999).  The Court has broad discretion in determining whether the

Daubert factors reasonably measure reliability in a given case.  Id. at 153,

119 S.Ct. 1167.


## III.   BORGWARNER'S MOTION TO EXCLUDE EXPERT TESTIMONY

### A.   Brent Robinson

BorgWarner seeks to exclude the testimony of Honeywell's

designated expert Brent Robinson on the grounds that Robinson failed to

provide a written expert report, as required by Federal Rule of Civil

---

[3]While the law of the Federal Circuit is applicable to substantive patent issues and to procedural issues which pertain to the field of patent law, when determining whether to admit expert testimony, the Court must look to the law of the Fourth Circuit. See, e.g., Micro Chem, Inc. v. Lextron, Inc., 317 F.3d 1387, 1390-91 (Fed. Cir. 2003) ("Whether proffered evidence should be admitted in a trial is a procedural issue not unique to patent law, and therefore we review the district court's decision whether to admit expert testimony under the law of the regional circuit[.]").

Procedure 26(a)(2)(B). [Doc. 105 at 22-30]. Honeywell counters that Robinson's testimony is purely factual testimony, and that he was designated as an expert only out of an abundance of caution because he is a person with specialized knowledge. Even if Robinson's testimony could be considered expert testimony, Honeywell contends, Robinson did not have to provide a written report because he was not "retained or specially employed" to provide expert testimony on behalf of Honeywell. Alternatively, Honeywell contends that any harm suffered by BorgWarner as a result of the failure to provide a written report is self-inflicted, as BorgWarner has had ample opportunity to conduct discovery about Robinson's expert opinions but has declined to do so. [Doc. 140 at 22-29].

### 1. Relevant Facts

Brent Robinson is the founder and president of B&R Mold, a company that makes tools used in investment casting. [Corrected Declaration of Brent Robinson, Doc. 41-2 at ¶¶2, 5]. He has made tools and die assemblies for BorgWarner, Honeywell, and Holset, including the tool developed in 1996 to manufacture the Holset Wheel ("the 1996 Tool") and the die assembly used to manufacture the BorgWarner compressor wheel that is the subject of the patents-in-suit. [Id. at ¶¶ 6-10].

In 2003, Honeywell entered into an Assignment and License Back agreement with B&R Mold, Brent Robinson and Steve Reigel (an employee of B&R Mold), by which Honeywell agreed to pay B&R Mold, Robinson and Reigel a total of $15,000 in exchange for their assignment of any rights they had in the subject patent applications. Additionally, as part of this agreement, B&R Mold, Robinson and Reigel agreed to "cooperate fully . . . and provid[e] all needed truthful testimony . . . if at any time [Honeywell] is threatened or sued with an infringement action based upon any patent or patent application pertaining to the assigned inventions . . . ." [Assignment and License Back, Doc. 107-8].

On May 8, 2009, Robinson was deposed in his personal capacity as a fact witness. [Declaration of Katherine D. Prescott ("Prescott Decl."), Doc. 107 at ¶17]. The day after this deposition, Honeywell disclosed Robinson as "a person who may provide evidence under Rules 702, 703 or 705 of the Federal Rules of Evidence." [Disclosure of Expert Testimony, Doc. 107-9]. BorgWarner, however, was not provided with a written report. In response to BorgWarner's inquiry as to why no report was provided, Honeywell contended that Robinson was not obligated to provide a written report because he had not been retained or specially employed to provide

7

expert testimony on behalf of Honeywell.  [Letter dated July 28, 2009, Doc. 107-10].  Unbeknownst to BorgWarner at the time, however, Honeywell's in-house litigation counsel had agreed to pay Robinson $105,000 for the design and construction of an automated tool to produce patterns for the Holset Wheel (the "2009 Tool") in order to test the hypothesis that the 1996 Tool could have been made fully automated, even though no such tool had been made at that time.  [Email dated July 14, 2009, Doc. 107-13; Email dated July 17, 2009, Doc. 107-14].

Robinson was deposed for a second time on August 28, 2009.  At this deposition, Robinson testified as follows:

> Q      In our first day of our deposition we discussed a July 1st, 2003 Assignment and License Back Agreement that you entered into and your company entered into with Honeywell.  Do you remember discussing that agreement?
>
> A      Yeah.
>
> Q      And as part of that agreement there was a $15,000 payment from Honeywell to B&R Mold; is that correct?
>
> A      Yes.
>
> **Q      Aside from that payment, as you sit here today have you received any other payment from Honeywell that in any way would be related to this case?**

**A     No.**

* * *

Q     Since your last deposition, the first day of your deposition, have you spoken to anyone at Honeywell regarding your deposition testimony?

A     No.

**Q     And again since your last deposition have you discussed the litigation more generally with anyone from Honeywell?**

**A     No.**                * * *

**Q     And since your first deposition, have you had any conversations with anyone about the case itself?**

* * *

A     Maybe my wife.

Q     Beside from your wife, no one else?

**A     No.**

[Deposition of Brent Robinson ("Robinson Dep."), Doc. 107-15 at 378-81]

(emphasis added).

BorgWarner did not learn of the existence of the 2009 Tool until the day after discovery had closed, October 13, 2009.[4]  On that day, BorgWarner received a video showing the 2009 Tool in operation but without any explanation as to the origin of the tool shown in the video. [Prescott Decl., Doc. 107 at ¶15].  Three days later, which was the deadline for exchanging rebuttal expert reports, Honeywell produced Christopher Reed's expert report, which relied upon the 2009 Tool and disclosed to BorgWarner for the first time Robinson's opinions (as conveyed to Reed) about the 2009 Tool.  [Id. at ¶16].  It was through *Reed's* report that BorgWarner learned for the first time of *Robinson's* opinion that the 2009 Tool demonstrated how the 1996 Tool could have been automated. The July correspondence evidencing the payment between Honeywell and Robinson for the development of the 2009 Tool was not produced to BorgWarner until November 5, 2009.  [Prescott Decl., Doc. 107 at ¶¶13-14].

---

[4]Honeywell mailed the video to BorgWarner on the last day of discovery, October 12, 2009, and BorgWarner received the video the following day.  [Prescott Decl., Doc. 107 at ¶15].

### 2.    Analysis

Honeywell contends that it was not required to produce an expert report for Robinson for two reasons.  First, it contends that Robinson will be providing mere "descriptive factual testimony" regarding his development of the 1996 Tool and the 2009 Tool.  Second, Honeywell argues that even if Robinson could be considered an expert, it has not retained him because he was not "paid for any testimony" and because Robinson himself "did not consider his work on the [2009 Tool] to be related to this litigation."  [Doc. 140 at 26].  The Court rejects both of these contentions.

First, Honeywell's argument that Robinson will provide only factual testimony at trial is specious.  It is evident that Honeywell intends to use Robinson to support its hypothesis that the 1996 Tool could have been fully automated by having him describe his creation of the 2009 Tool (which was created for the sole purpose of testing Honeywell's hypothesis) and by having him state his expert conclusion that the 2009 Tool demonstrates the automatability of that prior design.  Such testimony goes far beyond more "descriptive factual testimony," as it necessarily would involve Robinson answering hypothetical questions, based on his specialized knowledge and expertise, as to whether the 1996 Tool could have been automated in light

of the art of toolmaking as it existed in 1996.  See Certain Underwriters at Lloyd's, London v. Sinkovich, 232 F.3d 200, 203 (4th Cir. 2000) (noting that expert testimony involves responding to hypothetical questions and offering opinions based on specialized knowledge and experience).

Similarly, any testimony that Robinson might proffer regarding the 2009 Tool necessarily would involve proffering expert opinions.  While Honeywell contends that the 2009 Tool is merely an illustrative exhibit that demonstrates the automatability of the 1996 Tool, this argument ignores the fact that Robinson developed the 2009 Tool as an experiment to test Honeywell's hypothesis of automatability.  Rather than standing alone as an illustrative factual exhibit then, the 2009 Tool represents the embodiment of  Robinson's experimentation and testing of this hypothesis.

Additionally, in order to establish the relevance of the 2009 Tool, Honeywell must be able to show that the 2009 Tool replicates the 1996 Holset Wheel and could have been developed given the state of the art of toolmaking as it existed in 1996.  Laying this type of foundation necessarily would require opinion testimony from Robinson, based on his specialized knowledge of the Holset Wheel design and the art of toolmaking during the relevant period.

As for Honeywell's contention that Robinson was not "retained" as an expert witness, this argument is belied by the documentary evidence in this case. Honeywell has produced emails between Robinson and Honeywell's litigation counsel from July 2009 which establish that Honeywell had agreed to pay Robinson $105,000 to develop a fully automated tool for the Holset Wheel. It is difficult for the Court to reconcile Honeywell's assertion that Robinson did not believe this project to be related to this litigation with the fact that Robinson directed his tooling quote to Honeywell's outside litigation counsel, rather than business personnel at Honeywell. Moreover, Robinson's affirmative statement in his email that he needed permission from Cummins (the current owner of the Holset Wheel) to build the tool demonstrates that he knew that the tool was for the Holset Wheel design, not a Honeywell wheel design. [Doc. 107-13 at 2].

While Honeywell contends that Robinson was compensated solely to develop the 2009 Tool, it is clear that Honeywell intends to have Robinson testify about his development of this tool in order to support Honeywell's theory of invalidity. Given these facts, the conclusion is inescapable that Robinson has been retained as an expert witness in this case. The fact

that Robinson may not have been compensated by the traditional hourly rate for his testimony does not change this result:

> The terms "retained" and "specially employed" encompass a wide range of compensation agreements not limited to payment of an expert fee at an hourly rate. In the generally accepted meaning of the term in everyday usage, "retained" or "specially employed" ordinarily implies some consideration, a payment or reward of some kind, as consideration for being "retained" or "specially employed." Opposing counsel and the trier of fact are entitled to know what compensation is to be paid the expert for the study and testimony, even if the compensation is not in the form of money to be paid contemporaneously with the civil action.

Smith v. State Farm Fire and Cas. Co., 164 F.R.D. 49, 56 (S.D. W.Va. 1995) (citations and quotation marks omitted). Because Honeywell "retained" Robinson as an expert in this case, the Court concludes that Honeywell was required to have provided a written expert report detailing his opinions and the bases therefor pursuant to Rule 26(a)(2)(B).

Having determined that Robinson was "retained," the Court now must determine the appropriate sanction for Honeywell's failure to provide an expert report to BorgWarner. If a party fails to provide a written report for a retained expert witness, that party is precluded from using that witness at trial, "unless the failure was substantially justified or is harmless." Fed. R.

Civ. P. 37(c)(1). The burden is on the non-producing party to show substantial justification or harmlessness. <u>Carr v. Deeds</u>, 453 F.3d 593, 602 (4th Cir. 2006). The Court has "broad discretion to determine whether a nondisclosure of evidence is substantially justified or harmless for purposes of a Rule 37(c)(1) exclusion analysis." <u>So. States Rack and Fixture, Inc. v. Sherwin-Williams Co.</u>, 318 F.3d 592, 597 (4th Cir. 2003). In exercising this broad discretion, the Court must consider the following factors:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

<u>Id.</u>

In the present case, Honeywell offers no explanation, other than its belief that Robinson was not "retained," for its failure to provide a written report for Robinson. In light of the circumstances outlined above, the Court cannot conclude that Honeywell was substantially justified in maintaining this position. Nor has Honeywell demonstrated that its failure to provide an expert report for Robinson was harmless. Without the benefit of a written expert report from Robinson, BorgWarner would be subject to unfair

surprise at trial. Because it does not know the scope or bases for Robinson's opinions, BorgWarner cannot analyze the reliability of Mr. Robinson's opinions, nor can it adequately prepare to cross-examine him or have its experts prepare any opinions in rebuttal. As a result, the trial will likely be disrupted, as the Court will be required to resolve ongoing objections as Robinson offers surprise opinions and BorgWarner's experts offer their rebuttal opinions.

Contrary to Honeywell's argument, permitting a third deposition of Robinson would not necessarily alleviate the harm to BorgWarner. BorgWarner would be required to prepare for such a deposition without the benefit of a written report and thus would be left guessing as to what opinions Robinson might have and the bases for them. Furthermore, absent a written report, BorgWarner would not be able to identify all relevant documents in advance of such a deposition or otherwise adequately prepare to question him.

Nor would the belated submission of an expert report by Robinson necessarily remedy the harm. All of the parties' technical experts now have been deposed. Submission of a belated report by Robinson at this late date would require the Court to reopen discovery and would require

the parties to undergo the expense of additional rounds of depositions and supplemental reports and briefing, which would be completely disruptive to the trial schedule of this case.

In sum, because Honeywell failed to provide a written expert report for Robinson as required by Rule 26(a)(2)(B), and because its failure to do so was neither harmless nor substantially justified, the Court will exclude any expert testimony from Brent Robinson in this case.[5]

---

[5]The Court has serious concerns regarding the type of gamesmanship demonstrated by Robinson and Honeywell in this case. During his second deposition, Robinson flatly denied receiving "any other payment [other than the $15,000 assignment payment in 2003] from Honeywell that *in any way* would be related to this case" and further denied discussion this case with anyone, other than his wife, since his first deposition. [Robinson Dep., Doc. 107-15 at 378-81]. In light of the email correspondence between Robinson and Honeywell's litigation counsel, which occurred just weeks prior to this testimony, these statements are, at best, misleading and, at worst, perjurious. Although Honeywell's counsel was present during Robinson's testimony and was well aware of the agreement that Honeywell had reached with Robinson regarding the 2009 Tool, counsel made no attempt to correct or clarify Robinson's responses or otherwise disclose the existence of the parties' agreement to BorgWarner. Honeywell concealed the existence of the 2009 Tool throughout the remainder of the discovery period, waiting until the last day of discovery to mail a video of the tool in operation, without any explanation as to its origin or significance. Not until BorgWarner received the expert report of Christopher Reed three days later did it learn of Robinson's work on the 2009 Tool and his related opinions. The timing of Honeywell's disclosure effectively deprived BorgWarner of any opportunity to examine the 2009 Tool during the discovery period or to rebut Robinson's opinions in any meaningful manner. In the Court's view, Honeywell's failure to correct or clarify Robinson's misleading testimony and to disclose the existence of the 2009 Tool in a timely manner serve as additional bases for the exclusion of any expert testimony related to the 2009 Tool.

**B.    Christopher Reed**

BorgWarner also seeks to exclude certain opinion testimony from one of Honeywell's infringement experts, Christopher Reed.  For grounds, BorgWarner contends that Reed's opinions pertaining to the issue of divided infringement[6] consist purely of his factual conclusions based on no specialized training and thus does not assist the trier of fact.  BorgWarner further contends that Reed's opinions pertaining to the automation of the tool used to manufacture the Holset Wheel is not based on any specialized knowledge and is therefore unreliable.  [Doc. 105 at 12-17].

**1.    Reed's Background and Qualifications**

Reed received a Bachelor of Science in Architecture from Arizona State University in 1997 and a Master of Business Administration in Finance from Emory University in 2002.  [Rebuttal Expert Report of Christopher Reed ("Reed Rebuttal Report"), Doc. 107-1 at ¶8].  From 2003

---

[6]Direct infringement of a method patent generally requires a single party to perform every step of the claimed method.  BMC Resources, Inc. v. Paymentech, L.P., 498 F.3d 1373, 1380 (Fed. Cir. 2007).  Under a theory of "joint" or "divided" infringement, "where the actions of multiple parties combine to perform every step of a claimed method, the claim is directly infringed only if one party exercises 'control or direction' over the entire process such that every step is attributable to the controlling party, i.e., the 'mastermind.'" Muniauction, Inc. v. Thomson Corp., 532 F.3d 1318, 1329 (Fed. Cir. 2008), cert. denied, 129 S.Ct. 1585, 173 L.Ed.2d 677 (2009).  A key issue in this litigation is whether Honeywell controls or directs its suppliers, FS Precision and Howmet, such that every step of the claimed method of manufacturing the accused product is attributable to Honeywell.

to 2007, he was employed by Honeywell, first as a Program Manager and then as a Global Purchasing Manager. He left Honeywell in 2007 to join FS Precision Tech Company ("FS Precision") as Vice President and CFO, where he remained until 2009. He is currently the CEO of Reed Capital Managment, LLC in Los Angeles, California. [Id. at ¶9].

As a Program Manager at Honeywell, Reed managed production for Ford Motor Company and International Truck and Engine. In this role, Reed worked with casting vendors on quality issues, new tooling, new production lines, and qualification. He also worked on new product introductions, making sure that the correct vendors were in place. [Id. at ¶¶10-11]. When he became a Global Commodity Manager for Honeywell, Reed became responsible for the global strategy for procurement of wheels and precision products. In this role, Reed visited approximately 18 Honeywell-qualified wheel vendors and between 30 and 40 investment casting foundries that were seeking qualification by Honeywell for the production of wheels. [Id. at ¶13].

As Vice President of FS Precision, Reed was responsible for the turbo impeller business, which required him to interact with various casting customers, including BorgWarner Turbo and Emission Systems, Honeywell

19

Turbo Technologies, and Cummins Turbo Technologies. In his role as Vice President, Reed handled operations, procurement, customer relationships, and worked with various tool makers. He also was in charge of various aspects of turbocharger wheel products, including the purchasing of alloy materials, prototyping, and shipping the final product to customers. [Id. at ¶15].

## 2. Reed's Opinions

In his report served on October 16, 2009, Reed states that it is his opinion that Honeywell does not control or direct either FS Precision or Howmet during their casting of the accused wheels. [Id. at ¶¶ 22, 27]. He bases this opinion on his experience in managing supplier relationships both at Honeywell and at FS Precision. While acknowledging that his report focuses primarily on the operations at FS Precision, Reed explains that in his experience, "the interaction between FS Precision and its customers is typical of the industry" and that "[his] specific experience with Howmet confirms this general understanding." [Id. at ¶37]. As such, Reed concludes, his analysis applies equally to Honeywell's relationship with Howmet. [Id.].

Reed further purports to offers an opinion that the 1996 Tool could have been automated. As a basis for this opinion, Reed relies upon the testimony of Brent Robinson and Steven Reigel that the 1996 Tool could have been automated but was not developed as a fully automated tool due to Holset's price constraints. [Id. at ¶67]. Additionally, Reed bases his opinion on his review of the declaration of Sid Dyche, who was involved in the project to manufacture investment cast titanium compressor wheels for Holset in 1996. Dyche recalled that Robinson offered to make a fully automated tool at the time, but that Robinson was instructed to manufacture a semi-automatic tool instead because of Holset's budget. [Id. at ¶68]. Additionally, Reed states that he has inspected and observed the 2009 Tool in operation and has discussed the operation of this Tool with Robinson. [Id. at ¶69]. Based on his observations and his discussions with Robinson, Reed opines that the 1996 Tool "could have been, and has in fact now been, automated . . . ." [Id. at ¶72].

### 3.    Analysis

BorgWarner first argues that Reed's opinion testimony regarding the issue of divided infringement should be excluded because it consists simply of his factual conclusions based upon his experiences at FS

Precision and Honeywell, and that such testimony therefore would not assist a jury in determining a fact in issue. BorgWarner further contends that allowing Reed to testify to such factual matters in his capacity as an expert may cause the jury to afford undue weight to this testimony.

Contrary to BorgWarner's arguments, the fact that Reed's testimony is based on his personal experience does not preclude him from offering expert opinions in this case. "[T]he text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience." United States v. Wilson, 484 F.3d 267, 274 (4th Cir. 2007) (quoting Fed. R. Evid. 702, advisory committee's note). When a witness relies primarily on his own experience to render an expert opinion, "the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid 702, advisory committee's note. In the present case, the Court is satisfied that Reed may be able to establish a sufficient basis for his opinion regarding the issue of direction or control. Reed's report and deposition testimony establish that he has specific experience in managing the relationships between Honeywell and its suppliers, FS Precision and Howmet. Reed's opinions pertaining to the

issue of Honeywell's direction or control of its suppliers, therefore, shall not be excluded as unreliable or otherwise unhelpful to the jury.[7]

Next, BorgWarner contends that Reed should not be permitted to testify as to whether an automated tool could have been made to manufacture the prior art Holset Wheel because Reed does not have any specialized knowledge of designing and/or manufacturing pattern dies for compressor wheels that would qualify him to render such an opinion.

The Court agrees that Reed lacks the proper qualifications to render an opinion regarding the automation of the 1996 Tool. Reed does not have any formal education or technical training in designing or manufacturing pattern dies. Instead, he purports to rely upon his personal experience and familiarity with casting tools in concluding that the 1996 Tool could have been automated. Reed fails to explain, however, how his experience in working with supply vendors for Honeywell and FS Precision is an adequate basis for his opinions regarding the automation of the 1996 Tool.

---

[7]Under the mistaken belief that BorgWarner seeks to exclude Reed's testimony on the issue of divided infringement on the basis that this issue is not the proper subject of expert testimony, Honeywell argues that should the Court conclude that Reed's opinions on this issue is improper, then the Court also should preclude BorgWarner's expert, Dr. John Thorne, from offering any opinions on this issue as well. [Doc. 119 at 29]. The Court need not address this argument, as the Court has concluded that Reed may offer opinions as to whether Honeywell directs or controls the suppliers that perform the patented steps to manufacture the accused wheels at issue in this case.

While Reed testified that "there are certain things I can look at either on a print or a 3-D model to evaluate whether or not we would consider [a compressor wheel] to be manufacturable," [Deposition of Christopher Reed ("Reed Dep.", Doc. 107-4 at 9-10], Reed conceded in his deposition that he did not review any drawings or models used to create either the 2009 Tool or the 1996 Tool in reaching his opinions. Instead, he relied upon Robinson's assessment that the same CAD model was used for both tools. [Id. at 151-53]. Indeed, it appears that Reed relies entirely on the opinions expressed by Brent Robinson and Steven Reigel in concluding that the 1996 Tool could have been fully automated. Beyond parroting the opinions expressed by these witnesses, however, Reed fails to demonstrate any specialized knowledge or experience to support his opinions.

After carefully reviewing Reed's report and deposition testimony, the Court concludes that Reed brings no specialized knowledge or expertise to his review of the evidence relating to the automation of the 1996 Tool. As such, Reed's opinions are unreliable and shall be excluded.

### C.     John T. Goolkasian

Next, BorgWarner seeks to exclude the opinions of Honeywell's expert John T. Goolkasian with respect to the issues of validity and intent.

For grounds, BorgWarner contends that Goolkasian's technical opinions regarding the validity of the patents-in-suit are unreliable because he is not a person of skill in any relevant art. BorgWarner further contends that Goolkasian's opinions regarding intent should be excluded because such opinions would not be helpful to the jury. [Doc. 105 at 19-21].

### 1. Goolkasian's Qualifications

Goolkasian is a patent attorney. [Opening Expert Report of John T. Goolkasian ("Goolkasian Opening Report"), Doc. 107-5 at ¶1]. Since May 2005, he has practiced as a solo practitioner. Prior to May 2005, he was a partner in the law firm of Oblon, Spivak, McClelland, Maier & Neustadt, P.C. ("Oblon"). [Id. at ¶2]. Prior to joining Oblon, Goolkasian was employed for approximately 25 years in the United States Patent and Trademark Office ("USPTO"). At the USPTO, he served as a patent examiner for applications related to chemical polymers and miscellaneous chemical manufacture and then later as a member of the Board of Patent Appeals and Interferences. [Id. at ¶3; Deposition of John T. Goolkasian ("Goolkasian Dep."), Doc. 107-7 at 11, 21-22]. Goolkasian holds a Bachelor's degree in Chemical Engineering, and in the 1950's and 1960's he worked as an engineer for DuPont and the United States Rubber

Company, where his work primarily involved injection and compression molding of plastic parts.  [Goolkasian Opening Report, Doc. 107-5 at ¶10].

## 2. Goolkasian's Opinions

In his report, Goolkasian offers opinions regarding the general practices and procedures of the USPTO; the relationship between a patent applicant and the USPTO, including the duties of candor and disclosure required of an applicant; the parts of a patent in general and of the patents-in-suit in particular, their specification, and claims; and the subject matter and prosecution histories of the patents-in-suit.  [Id. at ¶14].  Goolkasian also offers various technical opinions bearing on the issue of validity, including opinions regarding the patents' compliance with the written description and enablement requirements of 35 U.S.C. § 112 [Id. at ¶¶47-48]; the best mode for the claimed invention [Id. at ¶¶49-50]; the motivation of a person of skill in the art to make certain changes to the compressor wheel design [Id. at ¶59]; the disclosure contained in certain prior art [Id. at ¶60]; the meaning of certain claim terms [Id. at ¶64]; and the conception and inventorship of the claimed invention [Id. at ¶¶79-85].  Additionally, Goolkasian offers an opinion that BorgWarner's alleged omission of a

certain prior art reference during the prosecution of the patents-in-suit "was intentional" [Id. at ¶78].

In his rebuttal expert report, Goolkasian proffers various opinions that Honeywell had a reasonably objective basis for believing that it was not infringing any valid patent claims [Expert Report of John T. Goolkasian dated Oct. 16, 2009 ("Goolkasian Rebuttal Report"), Doc. 142-14 at ¶¶29-30, 44].

### 3. Analysis

BorgWarner first moves to exclude Goolkasian's technical opinions regarding the validity of the patents-in-suit, on the grounds that he is not a person of skill in the pertinent art.[8]

The Federal Circuit has held that a trial court abuses its discretion when it "permit[s] a witness to testify as an expert on the issues of infringement or invalidity *unless that witness is qualified as an expert in the pertinent art*." Sundance v. Demonte Fabricating Ltd., 550 F.3d 1356, 1363 (Fed. Cir. 2008), reh'g denied, Jan. 22, 2009 (emphasis added). While

---

[8]At the claim construction stage, BorgWarner contended, and the Court so found, that a person of skill in "the pertinent art" relative to the patents-in-suit would have a minimum of five years of experience in compressor wheel design and would have an awareness of the processes by which compressor wheels are manufactured. [See Doc. 79-1 at 33-34].

recognizing that a patent lawyer may very well qualify as a technical expert, the Court cautioned that "such a qualification must derive from a lawyer's technical qualifications in the pertinent art," not merely from the lawyer's experience or expertise in the field of patent law. Id. According to Sundance:

> [A] witness not qualified in the pertinent art may not testify as an expert as to anticipation, or any of the underlying questions, such as the nature of the claimed invention, what a prior art reference discloses, or whether the asserted claims read on the prior art reference.
>
> Nor may a witness not qualified in the pertinent art testify as an expert on obviousness, or any of the underlying technical questions, such as the nature of the claimed invention, the scope and content of prior art, the differences between the claimed invention and the prior art, or the motivation of one of ordinary skill in the art to combine these references to achieve the claimed invention.

Id. at 1364 (citations and footnote omitted).

In the present case, Honeywell has failed to show that Goolkasian is qualified in the art relevant to the patents-in-suit. Goolkasian holds a B.S. in Chemical Engineering. Goolkasian has never worked in the investment casting field. [Goolkasian Dep., Doc. 107-7 at 11, 19]. He has never made tools for investment casting, never worked at a foundry, and never worked

with titanium.  [Id. at 19-20].  He does not consider himself to be a person of ordinary skill in the art of titanium investment casting, nor in the art of making tools for use in titanium investment casting.  [Id. at 20-21].  Even as a patent attorney, Goolkasian has never prosecuted any patent applications related to investment casting or titanium alloys.  [Id. at 22-23].  Nor does Goolkasian have any experience with compressor wheel design.  He has never worked as a designer of compressor wheels for air boost devices, and does not consider himself to be a person of ordinary skill in that art.  [Id. at 21].

While appearing to concede that Goolkasian is not a person of skill in the pertinent art, Honeywell contends that his opinions are nevertheless relevant and admissible because such opinions are offered from the perspective of a reasonable patent examiner evaluating a patent application and the relevant prior art.  There are two problems, however, with Honeywell's characterization of Goolkasian's testimony.  First, while Honeywell claims that Goolkasian is offering opinions from the perspective of a reasonable patent examiner, Goolkasian's report does not couch his opinions in such terms.  For example, Honeywell contends that in his report, Goolkasian provides an opinion as to whether a patent examiner

would have considered the invention to be obvious in light of a prior art turbine wheel, but Goolkasian's report makes no reference to what a patent examiner would believe.  [See Goolkasian Report, Doc. 107-5 at ¶59].  Rather, Goolkasian offers his own belief, based on his experience as an engineer, about how "engineering logic" would apply to compressor wheel design.  [Id.].  Similarly, Honeywell contends that Goolkasian offers opinions as to whether a Patent Office examiner would consider the enablement and written description of the patents-in-suit to be met, but Goolkasian's report mentions nothing about Patent Office practice in this regard.  [Id. at ¶¶47, 48].  Rather, Goolkasian offers his own opinion regarding validity, opining that a particular set of claim limitations is not described in either the specification or the original claims.  [Id.].

Second, even if Goolkasian does intend to offer opinions from the perspective of a reasonable patent examiner, he lacks the necessary experience and skill in the pertinent art so as to render such opinions relevant and admissible in this case.  Because he is not a person skilled in the pertinent art, he has no way of knowing what a reasonable patent examiner, who is presumed to be familiar with the level of skill in the

relevant art[9], would understand from the technical materials submitted. Because Goolkasian actually lacks the technical expertise to qualify as a person of ordinary skill in the art, the Court will preclude his opinions related to the issue of invalidity.

The Court further concludes that Goolkasian's opinion regarding intent, whether in the context of willful infringement or the inducement of infringement, also should be excluded. Honeywell's intent with respect to the patents-in-suit is a question for the trier of fact to decide and does not require the admission of expert testimony. See Fuji Photo Film Co. v. Jazz Photo Corp., 394 F.3d 1368, 1378 (Fed. Cir. 2005) (noting intent to induce infringement "is a factual determination particularly within the province of the trier of fact") (citation omitted); Oxford Gene Tech. Ltd. v. Mergen Ltd., 345 F.Supp.2d 431, 443 (D. Del. 2004) (allowing expert testimony as to "what the standard of behavior generally is when a corporation is confronted with an allegation of infringement," but excluding testimony "as to whether [defendant's] behavior met the standard of reasonableness. . . or regarding [defendant's] intent, motive, or state of mind, or evidence by

---

[9]See PowerOasis, Inc. v. T-Mobile USA, Inc., 522 F.3d 1299, 1304 (Fed. Cir. 2008) (noting that patent examiners "are assumed to have expertise in interpreting the references and to be familiar from their work with the level of skill in the art").

which such state of mind may be inferred").  Accordingly, the Court will exclude Goolkasian's expert testimony regarding Honeywell's intent to deceive the Patent Office, its intent to induce infringement, and its alleged recklessness or willfulness in infringing the patents-in-suit.

## IV.    HONEYWELL'S MOTION TO EXCLUDE EXPERT OPINIONS

### A.    Dr. J.C. Poindexter

Honeywell seeks to preclude BorgWarner's damages expert, Dr. J.C. Poindexter, from offering opinions on lost profit damages related to Honeywell's sales of turbocharger systems to Caterpillar for its ACERT program.  For grounds, Honeywell contends that Dr. Poindexter's opinions are inadmissible because BorgWarner did not have a turbocharger system to sell to Caterpillar and thus is not entitled to recover lost profits. Honeywell further argues that Dr. Poindexter's opinions are not the product of reliable principles or facts because he has not performed the necessary analysis to determine whether acceptable non-infringing alternatives existed.  Accordingly, Honeywell argues that the Court should exclude Dr. Poindexter's opinions regarding lost profits and limit him to testimony

regarding a reasonable royalty measure of damages. [Doc. 119 at 22-24; Doc. 173 at 7-13].

To recover lost profits, BorgWarner must show a reasonable probability that "but for" Honeywell's infringement, it would have made the infringing sales. Rite-Hite Corp. v. Kelley Co., 56 F.3d 1538, 1545 (Fed. Cir. 1995). BorgWarner can establish this "but for" causation by proving: (1) a demand for the patented product/method; (2) the absence of acceptable, noninfringing substitutes; (3) the manufacturing and marketing capacity to exploit the demand; and (4) the amount of profit it would have made absent Honeywell's infringement. See Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152, 1156 (6th Cir. 1978).

Even in the presence of acceptable, non-infringing alternatives, a patentee may recover lost profits using a market share analysis. State Indus., Inc. v. Mor-Flo Indus., Inc., 883 F.2d 1573, 1578 (Fed. Cir. 1989). "This market share approach allows a patentee to recover lost profits, despite the presence of acceptable, noninfringing substitutes, because it nevertheless can prove with reasonable probability sales it would have made 'but for' the infringement." BIC Leisure Products, Inc. v. Windsurfing Int'l, Inc., 1 F.3d 1214, 1219 (Fed. Cir. 1993).

The availability of lost profits is a question of law for the Court. "Only after the court has decided, as a matter of law, that lost profits are available does the jury then get to determine the amount of those lost profits." Wechsler v. Macke Int'l Trade, Inc., 486 F.3d 1286, 1293 (Fed. Cir. 2007).

Honeywell first argues that Dr. Poindexter's opinions are excludable because BorgWarner did not have a turbocharger system to sell Caterpillar for its ACERT program and thus cannot show that it is entitled to lost profits. Determining at this juncture whether lost profits are available to BorgWarner, however, would simply be premature. The parties are entitled to present evidence to the Court on this issue at trial. Once such evidence is presented, the Court will make a determination as a matter of law as to whether lost profit damages are available to BorgWarner and thus whether any evidence on the amount of those lost profits is even admissible.

Honeywell further argues that Dr. Poindexter's opinions are not the product of reliable principles or facts because he has not performed the necessary analysis to determine whether acceptable non-infringing alternatives existed. Upon reviewing Dr. Poindexter's reports and the forecast of evidence, however, the Court is satisfied that Plaintiff will likely be able to demonstrate a sufficiently reliable foundation for Dr. Poindexter's

opinion regarding the availability of acceptable non-infringing alternatives.
As explained in his reports and deposition testimony, Dr. Poindexter
considered a broad range of evidence in reaching his opinions, including
the testimony of Honeywell employees about the relative costs of
alternative and infringing wheels; estimates and quotes for the alternative
and infringing wheels; and opinions of BorgWarner's technical experts on
the cost-effectiveness of alternative and infringing wheels.  [Expert Report
of Dr. J.C. Poindexter ("Poindexter Report"), Doc. 121-9 at 6, 12-13, 15-18;
Supplemental Expert Report of Dr. J.C. Poindexter ("Poindexter Supp.
Report"), Doc. 121-10 at 4, 11-13].  Dr. Poindexter also reviewed several
quotes from BorgWarner suppliers from around 2001, as well as cost
estimates presented to the Patent and Trademark Office in 2002, which
indicated that machined wheels were significantly more expensive than
investment cast wheels.  [Poindexter Report, Doc. 121-9 at 15-17;
Poindexter Supp. Report, Doc. 121-10 at 12; Turbocam Facsimile dated
May 11, 2001, Doc. 121-13; Turbocam Facsimile dated Aug. 1, 2001, Doc.
121-14; BorgWarner Cost Drivers Document, Doc. 121-15; Email dated
May 11, 2001, Doc. 122-6; Email dated May 10, 2001, Doc. 122-7].  While
Dr. Poindexter disregarded certain cost estimates presented by

BorgWarner, such as those contained in Exhibit 354 to Joel Wiegert's deposition [see Doc. 121-6], Dr. Poindexter explained that he did so because some of the information contained in the graphs included in this exhibit were contradicted by the text of the email accompanying the graphs. In light of this conflict, and considering other evidence of actual cost quotes, Dr. Poindexter surmised that any conclusions drawn from the cost estimates contained in Exhibit 354 would be invalid. [Revised Supplemental Expert Report of Dr. J.C. Poindexter (Damages Report II), Doc. 174-2 at 12-13].

While Honeywell criticizes various aspects of Dr. Poindexter's analysis, and particularly his determination of the absence of noninfringing substitutes, the Court finds that such arguments go more to the weight to be afforded his testimony rather than its admissibility. See Aspex Eyewear, Inc. v. E'Lite Optik, Inc., No. CIV. A. 398CV2996D, 2002 WL 1751381, at *36 (N.D. Tex. Apr. 4, 2002). "Vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596, 113 S.Ct. 2786.

For these reasons, the Court will not exclude Dr. Poindexter's opinion regarding lost profit damages.

**B.    Paul Novak and Dr. John Thorne**

**1.    Skill in the Pertinent Art**

Honeywell first moves to preclude Paul Novak and Dr. John Thorne from testifying as to the ultimate issues of infringement and invalidity, on the grounds that neither Mr. Novak nor Dr. Thorne is a person skilled in the art pertinent to the patents-in-suit.  [Doc. 119 at 25-27].

Neither Dr. Thorne nor Mr. Novak considers himself a person skilled in the art of compressor wheel design [see Deposition of Paul Novak ("Novak Dep."), Doc. 122-8 at 103-04; Deposition of Dr. John K. Thorne ("Thorne Dep."), Doc. 122-10 at 198], and both expressly rely on the compressor wheel design expertise of BorgWarner's expert, Dr. Nicholas C. Baines, and his opinions regarding the design and aerodynamic properties of the subject compressor wheel, in reaching their own ultimate infringement and invalidity conclusions.  BorgWarner contends that Dr. Thorne and Mr. Novak may reasonably rely on Dr. Baines' opinions so long as those opinions are of the type reasonably relied upon by experts in their field.  In so arguing, BorgWarner compares their reliance on Dr. Baines'

opinions to a surgeon's reliance on a radiologist's x-ray report in reaching an ultimate medical diagnosis. This analogy, however, is inapposite to the situation at hand. Unlike surgeons, who regularly rely on radiologists' interpretation of x-rays in reaching medical diagnoses, toolmakers and investment casters do not regularly rely on compressor wheel design experts' opinions regarding patent infringement and validity in the course of their work. As such, Dr. Thorne and Mr. Novak may not rely on Dr. Baines' opinions in order to reach their own conclusions regarding the ultimate issues of infringement and validity.

Because Dr. Thorne and Mr. Novak admittedly lack any skill in the pertinent art of compressor wheel design, each shall be precluded from expressing opinions on the ultimate issues of validity and infringement in this case. See Sundance, 550 F.3d at 1363. As it is undisputed, however, that Dr. Thorne and Mr. Novak have relevant technical expertise in the fields of investment casting and toolmaking, respectively, the Court will permit Dr. Thorne and Mr. Novak to testify regarding the claim limitations and issues that are directly within their respective areas of expertise.

## 2. Novak's Opinions Regarding "Pullability"

Next, Honeywell contends that Mr. Novak should be precluded from testifying regarding his "model pullability" analysis. [Doc. 119 at 27-29].

In his opening report, Mr. Novak describes how he conducted a rough "model pullability analysis" of the accused compressor wheels in order to determine whether the patents' claim limitations were met. Specifically, this analysis consisted of using an epoxy paste to fill in the spaces between the adjacent blades of the compressor wheel and, after the epoxy hardened, trying to pull each model insert out along a curved or radial path as required by the patents. [Novak Opening Report, Doc. 123-3 at ¶144]. In a subsequent deposition, Mr. Novak conceded that this type of "pullability analysis" was "an old technique" that he does not currently use and that examination of the CAD models would result in a "more accurate" evaluation of pullability. [Novak Dep., Doc. 122-8 at 157, 161-62]. Honeywell argues that Mr. Novak should not be allowed to present opinions to the jury based on an admittedly outdated and inaccurate methodology that he himself no longer uses in his line of work. [Doc. 119 at 27-28].

The Court will not exclude this testimony. As Mr. Novak explained in his expert report, he does not rely on this "model pullability" analysis as

the sole basis for his opinions regarding the accused Honeywell wheels, but rather as confirmation of opinions he reached based on his review of the CAD drawings of the accused wheels and his review of videos showing the creation of wax patterns for such wheels.  [Novak Opening Report, Doc. 123-3 at ¶¶139-144].  Moreover, although Mr. Novak admitted that he does not use this technique regularly in his work, he did state that the use of model inserts is "an age old technique that's been used in the industry" to "help determine the pull" for investment cast parts made from injection molded patterns [Novak Dep. at 160], and that it "gives us a good idea" of "the pull analysis of a particular part" [Id. at 157].  While Novak admitted that use of this technique was "pretty rare," he explained that this was so because physical parts were usually not available for type of analysis.  [Id. at 161].

Furthermore, while Mr. Novak concedes that CAD modeling of the retraction paths would be "more accurate" and yield a "better evaluation" than using epoxy inserts, the possibility of a better technique hardly renders Mr. Novak's technique "inaccurate," as contended by Honeywell. See, e.g., Hometown Folks, LLC v. S&B Wilson, Inc., No. 1:06-cv-81, 2007 WL 4618445, at *4 (E.D. Tenn. Nov. 9, 2007) ("An expert's opinion is not

unreliable because the expert did not, arguably, employ the 'best' or 'most analogous' method[.]"); <u>United States v. Monteiro</u>, 407 F.Supp.2d 351, 366 (D. Mass. 2006) ("<u>Daubert</u> and <u>Kumho Tire</u> do not make the perfect the enemy of the reliable; an expert need not use the best method of evaluation, only a reliable one."). As Mr. Novak has established that the "model pullability" analysis is a reliable methodology, his opinions based in part on this analysis will not be excluded.

### 3. Novak's Opinions Regarding Automation

Next, Honeywell contends that Mr. Novak's opinions regarding the automation of the 1996 Tool for the Holset Wheel rely upon an improper methodology because he failed to examine the CAD model of the prior art Holset Wheel to determine whether an automated tool could have been built. Honeywell further contends that Mr. Novak's testimony improperly invades the province of the jury to determine the facts at issue. [Doc. 119 at 28].

Regarding the automation of the 1996 Tool, Mr. Novak opines that, based on his review of various Holset correspondence from the relevant time period, Holset had been unable to produce an aerodynamically efficient titanium compressor wheel in high volume at a relatively low cost.

[Expert Report of Paul Novak Regarding Secondary Considerations of Nonobviousness, Doc. 124-4 at ¶70]. Notably, Mr. Novak does not attempt to opine that it was *impossible* for Holset to have built an automated tool for the Holset Wheel. Rather, he proffers an opinion that Holset simply failed to design an *economical* automated tool for this wheel in 1996. Given the nature of this opinion, the fact that Mr. Novak did not examine the CAD modeling for the 1996 Holset Wheel and instead relied upon various correspondence from that time period regarding Holset's efforts to design an automated tool does not necessarily render his methodology flawed or his opinion in this regard unreliable.

Nor does the Court find that his testimony improperly invades the province of the jury. Based upon his technical knowledge and experience, Mr. Novak can provide substantive opinions based on his analysis of the Holset correspondence, which are technical materials that the jury may well require assistance in understanding. For these reasons, Mr. Novak's opinions regarding the automation of the 1996 Tool will not be excluded.[10]

---

[10]In a footnote, Honeywell contends that Dr. Baines likewise should be precluded from offering opinions regarding the automation of the 1996 Tool based on a review of Holset correspondence from the relevant time period. [Doc. 119 at 28 n.3]. For the reasons set forth above, the Court will not preclude Dr. Baines from proffering such opinions.

### 4.     Novak's Opinions Regarding Inventorship

Honeywell next contends that Mr. Novak should be precluded from offering opinions as to the inventorship of the patents-in-suit, as Mr. Novak simply relies upon the testimony of David Decker, one of the named inventors of the patents-in-suit, without consideration of any of the evidence to the contrary.  Honeywell further argues that the issue of inventorship is an improper subject for expert testimony.  [Doc. 119 at 28-29].

The Court agrees with Honeywell that Mr. Novak's opinions regarding inventorship are improper.  Although premised on underlying questions of fact, the determination of inventorship is ultimately a question of law. See Eli Lilly and Co. v. Aradigm Corp., 376 F.3d 1352, 1362 (Fed. Cir. 2004).  While Mr. Novak's explanation of the role of a toolmaker in the design process may be helpful to the trier of fact in determining Robinson's role in the design of the invention [see Rebuttal Expert Report of Paul Novak ("Novak Rebuttal Report"), Doc. 124-2 at ¶¶107-110], his conclusions regarding the ultimate legal issue of inventorship would not serve to assist the trier of fact.  See Woods v. Lecureux, 110 F.3d 1215, 1220 (6th Cir. 1997) ("It is, therefore, apparent that testimony offering

nothing more than a legal conclusion -- i.e., testimony that does little more than tell the jury what result to reach -- is properly excluded under the Rules."); Weinstein's Federal Evidence § 704.04[2][a] (2d ed. 2003) ("The most common reason for excluding opinion testimony that gives a legal conclusion is lack of helpfulness . . . . The testimony supplies the jury with no information other than the witness's view of how the verdict should read.").  Accordingly, Mr. Novak will be precluded from offering any opinions on the ultimate legal issue of inventorship.

**V.     ORDER**

For the foregoing reasons, **IT IS, THEREFORE, ORDERED** that the Plaintiffs' Motion to Exclude from Evidence Expert Testimony of Christopher Reed, John T. Goolkasian, and Brent Robinson [Doc. 104] is **GRANTED** with respect to the expert testimony of Brent Robinson; **GRANTED** with respect to any opinion testimony from Christopher Reed regarding the automation of the tool used to manufacture the Holset Wheel; and **GRANTED** with respect to the opinion testimony of John T. Goolkasian regarding the issues of validity and intent.  In all other respects, the Plaintiff's Motion [Doc. 104] is **DENIED**.

**IT IS FURTHER ORDERED** that the Defendant's Motion to Exclude Certain Expert Opinions of Dr. J.C. Poindexter, Paul Novak, and Dr. John Thorne [Doc. 118] is **GRANTED** with respect to any opinion testimony from Paul Novak and Dr. John Thorne regarding the ultimate issues of infringement and invalidity and **GRANTED** with respect to any opinion testimony from Paul Novak regarding the inventorship of the patents-in-suit. In all other respects, the Defendant's Motion [Doc. 118] is **DENIED**.

**IT IS SO ORDERED.**

Signed: September 25, 2010

Martin Reidinger
United States District Judge